[Civ. No. 18682.   Second Dist., Div. One.   May 6, 1952.]

HENRIETTA WEXLER, Respondent, v. CITY OF LOS ANGELES, Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, and Victor P. Spero, Deputy City Attorney, for Appellant.

Gilligan & Pratt for Respondent.

DRAPEAU, J.—The instant action for wrongful death of plaintiff's minor son was brought pursuant to the Public Liability Act, sections 53050 and 53051, Government Code.

The complaint alleged that on March 6, 1949, defendant city owned and maintained a public beach and playground in the Venice area; that for nine months prior to that date, due to defendant's negligence a dangerous and defective

condition had existed thereon; that defendant had notice of such defective condition as early as September 29, 1948, but failed to act to remedy it or to protect the public against it. It was further alleged that on said March 6, 1949, plaintiff's minor son while playing on said public beach was drowned in an open pool of water which had been allowed to collect and remain at the end of a storm drain on said public beach and playground. There followed allegations of the presentment to and rejection by defendant of plaintiff's claim for damages.

The amended answer denied generally and specifically the allegations of the complaint and set up the affirmative defenses of (1) contributory negligence of the minor; (2) concurring negligence of plaintiff; (3) unavoidable accident; (4) defect in parties plaintiff, the natural father being a necessary party under sections 376 and 377 of Code of Civil Procedure.

From a judgment awarding plaintiff $10,000 damages, defendant city appeals.

Evidence was presented to the effect that defendant in preparing a building site for the Hyperion sewage plant, removed therefrom several million cubic yards of sand which was placed along the shore line of the Pacific Ocean from El Segundo to Santa Monica. This was done under a master plan of shore line development in order to widen the beach oceanward and develop a modern playground.

One of the storm drains in the Venice area had its outlet on the shore line at the end of Thornton Avenue. After the widening operation this outlet was 300 feet from the mean high tide line. The plan was to extend this outlet when the final width of the beach was determined and the location of the new shore line definitely located. In the meantime, the water from the storm drain ran in an open ditch to the ocean across the public beach. Very often the action of the surf and waves caused sand to block the outlet of the storm drain, resulting in an accumulation of water in a pool on the beach.

Plaintiff and her 3½-year-old son lived in a dwelling about a block from the public beach and two blocks north of Thornton Avenue. Early in the morning of March 6, 1949, the little boy went out to play in his yard, which was completely fenced and the gate locked. During the morning, Robert Cummings, aged 5½ years, together with Billy and Susan Black, aged 4 and 3½ years, respectively, all living

in the neighborhood, went across the street to play with Jay Wexler, plaintiff's son. Robert unlocked the gate and they all went through into the Wexler yard. After playing there a little while, they took Jay with them and went over to the Black's yard. After a short time, they all went down to the beach where they played in the dry sand. They then went over near the storm drain and took off their shoes. Robert had a carton and they took water out of the drain and made castles. As they played, Robert told Jay not to go in the water. Robert did not see Jay when he went in the water, but Billy Black told him "Jay is in the water." When Robert turned around the water was up to Jay's chest and "He kept on sinking. . . . and before I knew it he was under."

Myron Cox, chief lifeguard for the city of Los Angeles, who recovered the body of the drowned child, testified that he entered the shallow end of the pool of water from dry sand on the shoreside; that the water was very muddy, and he first contacted the body with his foot; that it came up freely from the water; that he picked up the child in water that was waist deep, i. e., $3\frac{1}{2}$ feet; that the bottom of the pool was "absolutely concave . . . it was solid sand, but your feet would move into it, because it was rather muddy and murky. . . . There was no hole in the bottom . . . there was a little bit of a step-off there from the side of the pool."

There was evidence that the deceased child was sheltered and well cared for; was kept in an enclosed yard where he played with his tricycle; that he was not allowed to run around and had never been down to the beach by himself; that the lock on the gate was a sliding bar type which the child was unable to open.

On the question of notice to defendant, Mr. A. G. Johnson, beach designing engineer for the city, testified that on September 29, 1948, he "recommended to the Board of Public Works that the Director of the Bureau of Sanitation be instructed to excavate a trench across the new fill at each (storm drain) outlet and to maintain these trenches until the storm drains can be extended." · He further testified that the trenches were opened from "time to time." However, there was evidence that the trenches or ditches were almost never opened, the witness Caron testifying that he was on the beach frequently around the time of the accident, and never saw the Thornton Avenue ditch open; that there was always sand at the end of the pool which kept the water

from running out into the ocean. Likewise, the witness Diebold testified that he wrote letters to the mayor, the city council, the city engineer and to the board of public works as early as October 4, 1948, and complained about the blocked storm drains, but that "absolutely nothing" was done until after the death of plaintiff's son.

The trial court found that "for the last nine months immediately prior to March 6, 1949, due to the carelessness and negligence of the City of Los Angeles, there was a dangerous and defective condition existing on the beach and playground at Venice, near the Thornton Avenue Storm drain, and that the defendant . . . had notice of the dangerous and defective condition as early as September 29, 1948, and continuously thereafter up to and including March 6, 1949, the date of the death of plaintiff's minor son; the Court further finds that notwithstanding the notice which the defendant had of the dangerous and defective condition, the defendant failed and refused to take any action to remedy the dangerous and defective condition, or to protect the public against said dangerous and defective condition. . . .

"The court finds further that due to the carelessness and negligence of the defendant . . . and due to the dangerous and defective condition of the public beach at Venice, the said minor child . . . was drowned in an open pool of water which was allowed to collect and remain at the end of the storm drain on the public beach and playground."

The court also found that the deceased minor child "did not know or realize the danger of wading in or falling into the open pool of water complained of . . . that Jay Marlin Wexler was not negligent or careless in entering into said pool of water, and he did not know the purpose for which the pool was intended to be used, and had a right to assume that the pool would be safe for him to use and that the pool of water was on a public beach intended for the use of children."

It is here contended by appellant that the beach was not in a dangerous or defective condition by reason of the existence of the pool of water; that there was nothing dangerous or defective about the pool in which the drowning occurred; that the respondent was guilty of contributory negligence, and that the father of the deceased minor is a necessary party to the action.

Section 53051, Government Code (Public Liability Act), provides that "A local agency is liable for injuries to per-

sons and property resulting from the dangerous or defective condition of public property if the legislative body, board or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

This case was brought and tried on the theory that the outlet of the storm drain should never have been left in the middle of the newly widened beach in the first place. Secondly, since it was permitted to remain here, it should have been kept open so that the water could drain into the ocean and not collect in a deep pool on the public beach. The very presence of the pool on the beach was the result of appellant's negligence in failing to properly maintain the storm drain.

█ And, as stated in *Bauman* v. *San Francisco*, 42 Cal. App.2d 144, 153 [108 P.2d 989]: A dangerous or defective condition within the meaning of the Public Liability Act "can be created by the use or general plan of operation of government-owned property, as well as by a structural defect."

In *Arellano* v. *City of Burbank*, 13 Cal.2d 248, 254, 255 [89 P.2d 113], our Supreme Court held that "The theory of the act seems to be that liability is imposed not alone for the dangerous condition, but for the failure to remedy it, upon knowledge or notice thereof. . . . It is well settled in this state that when dealing with cases falling under the provisions of the Public Liability Act . . . each of such cases must depend upon its own state of facts and that no hard and fast rule can be applied in the great majority of cases."

The court in *Long* v. *Standard Oil Co.*, 92 Cal.App.2d 455, 466 [207 P.2d 837], stated: "Whether the condition was one which the defendant should have known involved an unreasonable risk of death or serious injury to children was a question of fact."

█ The evidence shows that the water in the pool was muddy and murky; that the pool was shallow at one end but that the depth of the water quickly increased to $3\frac{1}{2}$ feet. The deceased child was $3\frac{1}{2}$ years old, was 3 feet, $2\frac{1}{2}$ inches tall and weighed 39 pounds. When his companion saw him in the pool, the water had reached the child's chest; he was then sinking and immediately disappeared from view.

The hazard here in question was the direct result of appellant's failure to follow the recommendation of its engineer, to wit: To excavate a trench across the widened beach from the outlet of the storm drain, and to keep the trench open and free from sand so that the water therefrom could run into the ocean.

In the circumstances presented, the findings of the trial court that a defective and dangerous condition existed on the beach and playground within the meaning of the Public Liability Act; that appellant had notice of the condition and failed to remedy it; and that this dangerous and defective condition was the proximate cause of the drowning, are amply supported by the record.

Appellant urges that there was an entire lack of parental supervision or control over the movements or wanderings of the deceased minor, and therefore the mother was guilty of contributory negligence as a matter of law.

■ Ordinarily, contributory negligence is a question of fact for the trial court. And in *Christiana* v. *Rattaro*, 81 Cal. App.2d 597, 599 [184 P.2d 682], the court held that it was a question of fact for the jury whether the mother's lack of continuous supervision over a young boy was negligence under all the circumstances there shown.

■ As hereinbefore stated, evidence was presented to the effect that the deceased child in this case was sheltered and well cared for; that he played in a yard completely enclosed by a fence and that the lock on the gate was of a type which he could not open; that he was not permitted to run around the neighborhood unattended and had never been to the beach by himself.

This evidence was sufficient to support the trial court's finding that respondent was not negligent in any way in the care of her minor son. ■■ Appellant also urges that the natural father of the deceased minor is a proper, necessary and indispensable party to this action.

On the date of the death of respondent's minor child, section 376 of the Code of Civil Procedure read in part as follows:

''The father of a minor, or if the father is dead, or the parents of said minor are living separate or apart, and the mother of the minor then has care or custody of said minor, then the mother may maintain an action for the injury or death of said minor child.''

An amendment to this section effective October 1, 1949,

provides that "The parents of a legitimate unmarried minor child, acting jointly, may maintain an action for injury to such child caused by the wrongful act or neglect of another. If either parent shall fail on demand to join as plaintiff in such action, or is dead or cannot be found, then the other parent may maintain such action, and the parent, if living, who does not join as plaintiff must be joined as a defendant and, before trial or hearing of any question of fact, must be served with summons personally or by sending a copy of the summons and complaint by registered mail with proper postage prepaid to such parent's last known address with request for a return receipt. . . . The respective rights of the parents to any award shall be determined by the court."

The record herein discloses that respondent was granted a divorce from the father of the deceased child on December 10, 1946 in the State of Ohio. Custody of the child was then given to her. Respondent testified that she married her present husband in Ohio and they left that state early in 1947; that the last time she saw the father of her son was about three months before the divorce and she had known nothing of his whereabouts since that time. The deceased child was supported by his stepfather, whose name he bore.

The court found that the present sections 376 and 377, Code of Civil Procedure were not in effect on March 6, 1949, and that respondent was entitled to proceed with this action under section 376 as it existed on March 6, 1949, the date of the death of the child.

Respondent's right of action for the wrongful death of her minor child vested in her on the date of his death and it is not within the power of the Legislature to impair such vested right. (See 5 Cal.Jur. 751, section 145 and authorities there cited; and also *California Emp. etc. Com.* v. *Payne,* 31 Cal. 2d 210, 215 [187 P.2d 702], where it is stated: "Where a statute operates immediately to cut off an existing remedy and by retroactive application deprives a person of a vested right, it is ordinarily invalid because it conflicts with the due process clauses of the federal and state constitutions.")

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied May 28, 1952, and appellant's petition for a hearing by the Supreme Court was denied June 26, 1952.